UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

BILLIE J. PRICE                                                                                                    PLAINTIFF

V.                              Case No. 3:22-CV-00320-BBM

MARTIN O'MALLEY, Commissioner,
Social Security Administration[1]                                                              DEFENDANT

# ORDER

## I.    INTRODUCTION

On August 25, 2020, Plaintiff Billie J. Price ("Price") applied for Title II disability benefits. (Tr. at 25). In the application, she alleged that her disability began on August 4, 2020. *Id*. In a written decision dated March 9, 2022, an Administrative Law Judge ("ALJ") denied Price's application. (Tr. at 24–43). The Appeals Council denied her request for review on November 21, 2022. (Tr. at 1–7). The ALJ's decision now stands as the final decision of the Commissioner, and Price has requested judicial review.

For the reasons stated below, the Court affirms the decision of the Commissioner.[2]

---

[1] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of the Social Security Administration. Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner O'Malley is automatically substituted as the Defendant.

[2] The parties have consented in writing to the jurisdiction of a United States Magistrate Judge.

## II.     THE COMMISSIONER'S DECISION

At Step One of the required five-step sequential evaluation process for determining whether an individual is disabled, the ALJ found that Price had not engaged in substantial gainful activity since the alleged onset date of August 4, 2020.[3] (Tr. at 27). At Step Two, the ALJ determined that Price has the following severe impairments: degenerative disc disease, osteoarthritis, migraines, diabetes, history of transient ischemic attack ("TIA"),[4] and history of congestive heart failure ("CHF"). (Tr. at 28).

The ALJ determined at Step Three that Price's impairments did not meet or equal a listed impairment.[5] (Tr. at 29). Before proceeding to Step Four, the ALJ determined that Price had the residual functional capacity ("RFC") to perform work at the light exertional level, with additional restrictions: (1) no more than occasional stooping, kneeling, crouching, crawling, and balancing; (2) no work around hazards, such as unprotected heights or dangerous moving mechanical parts; and (3) no concentrated exposure to temperature extremes, humidity, or sunlight. *Id*.

---

[3] The ALJ followed the required five-step sequence to determine: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)–(g), 416.920(a)–(g).

[4] A transient ischemic attack (TIA) is a temporary period of symptoms similar to those of a stroke. A TIA usually lasts only a few minutes and doesn't cause permanent damage. *Transient ischemic attack (TIA)*, MAYOCLINIC.ORG, https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679.

[5] 20 C.F.R. Part 404, Subpt. P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

At Step Four, the ALJ utilized the testimony of a Vocational Expert ("VE") to determine that Price was capable of performing her past relevant work as a housekeeper. (Tr. at 42–43). Therefore, the ALJ concluded that Price was not disabled. *Id*.

## III. DISCUSSION

### A. Standard of Review

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> [O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision. Reversal is not warranted, however, merely because substantial evidence would have supported an opposite decision.

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (internal quotations and citations omitted).

In clarifying the "substantial evidence" standard applicable to review of administrative decisions, the Supreme Court has explained: "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . 'is more than a mere scintilla.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 59 S. Ct. 206, 217 (1938)). "It means—and means only—'such relevant evidence as a reasonable mind might accept

3

as adequate to support a conclusion.'" *Id*.

### B. Price's Arguments on Appeal

Price contends that the evidence supporting the ALJ's decision to deny her application for benefits is less than substantial. She argues that: (1) the ALJ did not properly evaluate the seven medical source statements from her primary care physician ("PCP"), James E. Zini, D.O. ("Dr. Zini"); (2) the RFC did not incorporate all of Price's limitations; and (3) the ALJ should have found Price to be disabled based on the Medical-Vocational Guidelines ("Grids").

#### 1. Medical Source Statements

First, Price alleges that the ALJ did not properly evaluate the seven medical source statements from her treating PCP, Dr. Zini. Contrary to this assertion, however, the Court finds that the ALJ evaluated each of the medical source statements from Dr. Zini but found that Dr. Zini's opinions were not well supported by the record and were inconsistent with the evidence of record as a whole. (Tr. 29–42).

Specifically, the record evidence related to Price's impairments revealed only mild-to-moderate conditions. After going to the hospital for a TIA (defined above) on August 4, 2020, CT and CTA exams were normal, and Price was discharged that same day because she refused to be admitted or transferred to a facility with a neurology clinic. (Tr. at 32, 36, 379–380, 398–399). The following month, neurology records showed full motor strength with normal reflexes and normal sensation in the extremities.[6] (Tr. at 420–421). She had a

---

[6] Normal clinical findings may support an ALJ's decision to deny benefits. *See Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).

normal gait and posture. *Id.* Price's neurologist prescribed Crestor and advised her to stop smoking. *Id*. Price did not stop smoking.[7] (Tr. at 494, 537, 579). Price declined to have a brain MRI and did not follow up with neurology. (Tr. at 420–421, 433). There is no more evidence of TIA in the record.

While Price suffered from congestive heart failure, ejection fraction testing was typically normal, and various studies of the heart revealed only mild findings. (Tr. at 370–372, 408–409, 511–512, 555–557, 587–588). Dr. Zini observed that Price's heart condition was stable in November 2021. (Tr. at 537). Dr. Zini also encouraged weight loss and healthy lifestyle changes. *Id*. Again, Price did not modify her lifestyle with respect to smoking. (Tr. at 537, 579).

Price alleged disabling migraine headaches, but treatment was conservative, and she responded well to medication management. (Tr. at 537, 579). In November 2021, Dr. Zini noted that Price was doing well with respect to migraines, and she denied headaches. (Tr. at 537). In December 2021, Dr. Zini wrote that Price had not had a headache since starting Topiramate.[8] (Tr. at 552). With regard to Price's kidney condition, it did not require treatment, improved when her Creatinine improved, and Price has not shown that it was disabling. (Tr. 28). Dr. Zini simply urged her to drink more water. (Tr. at 476, 501, 537, 579, 590).

---

[7] Refusal to follow a prescribed course of treatment undercuts a claimant's allegations of disability. *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997).

[8] Impairments that are controllable or amenable to treatment do not support a finding of total disability. *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000).

Dr. Zini filled out seven checkbox medical statements based on Price's variety of impairments. (Tr. at 539–571). The statements had no citation to medical evidence and contained little elaboration.[9] *Id*. In the statements, Dr. Zini opined that Price was unable to work based on functional limitations.

In six pages of his 19-page decision, the ALJ meticulously analyzed each of these opinions, and he gave good reasons for finding them generally unpersuasive.[10] (Tr. at 35–41). He noted that Dr. Zini's own notes showed good response to treatment. Dr. Zini did not suggest aggressive treatment and, instead, recommended lifestyle modification. At many of Price's visits to Dr. Zini, clinical exams were grossly normal. And the ALJ observed that Dr. Zini's extreme restrictions were based primarily on Price's subjective complaints (because there was no basis for the extreme restrictions in the medical record).[11] (Tr. at 35).

---

[9] A conclusory checkbox form has little evidentiary value when it cites to no medical evidence and provides little or no elaboration. *Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012).

[10] ALJs are required to analyze whether opinion evidence is persuasive based on: (1) supportability; (2) consistency with the evidence; (3) relationship with the claimant [which includes; (i) length of treatment relationship; (ii) frequency of examinations; (iii) purpose of the treatment relationship; (iv) extent of the treatment relationship; and (v) examining relationship]; (4) provider specialization; and (5) any other important factors. *See* 20 C.F.R. § 404.1520c(a)–(c). The "more relevant the objective medical evidence and supporting explanations presented" and the "more consistent" a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be. 20 C.F.R. §§ 404.1520c(c)(1)–(2), 416.920c(c)(1)–(2).

[11] Functional limitations must have a basis in the medical evidence and are not established based solely on a claimant's statement of symptoms. *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004).

Price's allegations of pain and her stated inability to perform activities were outsized compared to the medical evidence.[12] While Dr. Zini tried to paint Price as unable to perform virtually any work functions, the record evidence suggests she is not that limited (the ALJ wrote that Dr. Zini's statement that Price would miss four days of work was pure speculation).[13] (Tr. at 39). The ALJ properly considered the record as a whole when he found Dr. Zini's opinions unpersuasive, and the ALJ explained thoroughly his reasons for so doing.[14] The Court finds no error in the ALJ's analysis.

---

[12] With regard to Dr. Zini's expressed opinion regarding Price's prior TIA/stroke, for example, the ALJ stated:

> The undersigned finds Dr. Zini's opinion unpersuasive. As noted above, Dr. Zini's expressed opinions are quite conclusory, providing very little explanation of the evidence relied on in forming his opinion. Dr. Zini apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. This seems to be a sympathetic assessment in order to help the claimant obtain disability. Although Dr. Zini is the claimant's PCP and has treated her for several years, there are no laboratory and/or diagnostic test results which he performed that demonstrate and/or support his severe physical limitations and restrictions.

(Tr. at 36).

[13] While Price claimed at the hearing that she could hardly do any daily activities, a function report that she filled out in October 2020 showed otherwise. (Tr. at 260–270). She said on the report that she could attend to personal care, drive, socialize with others, shop in stores, watch TV, and perform some household chores. Such daily activities undermine her claims of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003).

[14] The ALJ also considered the State Disability Determination Services medical expert opinions and found them to be persuasive. (Tr. at 41). Those opinions stated that Price could perform light work with additional limitations. (Tr. at 103–131).

2. **The RFC**

Next, Price contends that the RFC did not fully incorporate her limitations and that the questions posed by the ALJ to the VE about work abilities also did not incorporate the alleged limitations.[15] As noted above, however, treatment was conservative, objective findings were benign, clinical exams were grossly normal, and Price responded positively to treatment. She could perform a variety of daily activities. The ALJ considered the foregoing in his line of questioning to the VE and when he formulated the RFC. (Tr. at 93–95). The decision of the Commissioner is affirmed on this point.

3. **Step Five Analysis**

Finally, Price argues that the ALJ should have proceeded to Step Five because Price is incapable of performing past work. The Court finds no error in the ALJ's determination that Price could perform past relevant work at Step Four.

"If an applicant's impairments are [only] exertional, (affecting the ability to perform physical labor), the Commissioner may carry his burden [at Step Five] by referring to the Medical-Vocational Guidelines or 'Grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." *Gray v. Apfel*, 192 F.3d 799,

---

[15] A claimant's RFC represents the most she can do despite the combined effects of all of her credible limitations and must be based on all credible evidence. *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) (citing *Flynn v. Astrue,* 513 F.3d 788, 792 (8th Cir. 2008)). In determining the claimant's RFC, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments. *Ostronski v. Chater,* 94 F.3d 413, 418 (8th Cir. 1996) (citing *Vaughn v. Heckler,* 741 F.2d 177, 179 (8th Cir. 1984)). A hypothetical question posed to the VE need only include those impairment and limitations found credible by the ALJ. *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (citing *Forte v. Barnhart,* 377 F.3d 892, 897 (8th Cir. 2004)).

8

802 (8th Cir. 1999) (citations omitted). If the applicant has impairments that are not exertional, use of the Grids is inappropriate. *Banks v. Massanari*, 258 F.3d 820, 827 (8th Cir. 2002) (citations omitted).

Price's claim that the ALJ should have applied the Grids fails because her RFC included impairments that were not exertional; in any event, the ALJ found, at Step Four, that Price was not disabled because she could perform past relevant work. The Court finds that the Commissioner's decision was supported by substantial evidence.

## IV.   CONCLUSION

There is substantial evidence to support the Commissioner's decision to deny benefits. The ALJ properly analyzed Dr. Zini's opinions, and the RFC incorporated all of Price's credible limitations. Additionally, the court finds no error in the ALJ's analysis regarding Price's ability to perform past work. The finding that Price was not disabled within the meaning of the Social Security Act, therefore, must be, and hereby is, AFFIRMED. Judgment will be entered for the Defendant.

DATED this 25th day of March, 2024.

_____
UNITED STATES MAGISTRATE JUDGE